Filed 6/30/21  Mahaffa v. McGraw CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| KADEN MAHAFFA, | B300108 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 19STCV04166) |
| v. | |
| PHIL MCGRAW et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Holly J. Fujie, Judge.  Affirmed.

Moneymaker & Stewart and Ryan Stewart for Plaintiff and Appellant.

Jackson Walker, Charles L. Babcock, Nancy Hamilton; Ford, Walker, Haggerty & Behar, Neil S. Tardiff and William C. Haggerty for Defendants and Respondents.

\* \* \* \* \* \*

Appellant Kaden Mahaffa (appellant) appeals from an order granting a special motion to strike her complaint pursuant to Code of Civil Procedure section 425.16 (section 425.16) (anti-SLAPP motion).[1]  Appellant initiated this action against Dr. Phillip C. McGraw (McGraw); CBS Television Services, Inc.; and Peteski Productions, Inc. (collectively respondents), after appellant appeared as a guest on an episode of the nationally syndicated television program *Dr. Phil* (CBS Television Distribution) (the show).  The trial court granted respondents' anti-SLAPP motion on the grounds that the gravamen of appellant's complaint implicated respondents' right to free speech on a matter of public interest and that appellant failed to submit evidence showing a probability that she would prevail on any of her claims.  We find no error and affirm the judgment.

## FACTUAL BACKGROUND

Appellant is a resident of Nevada, an author and self-proclaimed mental health professional.  She is the author of The Mama Trauma Justice Project and the House of Mirrors Theory.  Appellant purports to aid individuals with conditions such as autism and posttraumatic stress disorder.  Appellant also claims that her social media accounts and Web site received little attention prior to her appearance on the show.  Appellant alleged that she has struggled with mental health issues since she was a child.

The show is a television daytime talk show, which claims to provide "the most comprehensive forum on mental health issues

---

[1]     A special motion to strike under section 425.16 is also known as an anti-SLAPP motion.  (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1130.)

2

in the history of television."  McGraw is the host.  "Using the power of television, Dr. McGraw presents compelling stories about real people with a variety of emotional and behavioral problems, stripping away the shame and embarrassment that too often keep people from seeking help."  On his Web site, McGraw publicizes his "academic training and professional qualifications," including "a Doctoral degree in clinical psychology from the University of North Texas, followed by a post-doctoral fellowship in forensic psychology from the Wilmington Institute."  McGraw was a licensed psychologist and practiced clinical psychology.

Appellant alleged that, "[b]y holding himself out as a world-renowned mental health professional whose goal is to remove the stigma associated with psychological disorders and demonstrate their proper treatment," he "suggests to potential guests of the Dr. Phil Show that their appearances will be handled by a caring physician who has their best interests at heart and will do them no harm."

**Respondents solicit appellant to appear on the show**

Appellant alleged that she was contacted by a television producer representing the show who asked her to travel to Los Angeles and appear on an episode scheduled for taping in February 2017.[2]  The producer told appellant that the show would be about the childhood abuse that appellant's boyfriend, Matthew, alleged he had suffered at the hands of his mother and grandmother.  The producer also informed appellant that the purpose of her appearance would be to support Matthew as he

---

[2]      The producer, who was not named in appellant's complaint, was later identified only as "Mike."

3

confronted his alleged abusers. Appellant alleges that she relied on these statements in agreeing to appear on the show.

During a series of preshow telephone interviews, text messages, and taped segments, appellant disclosed that she had a history of mental illness. She also purported to have various supernatural powers, including an ability to communicate with the dead, read minds, see with X-ray vision, and intuitively write ancient languages. Appellant said she developed these powers after she "died seven times" and was brought back to life to be a "messenger for God."

On two occasions before appearing on the show, appellant signed releases. On February 5, 2017, prior to traveling to Los Angeles to appear on the show, appellant signed the first release. She signed the second one on February 8, 2017, the day the show was taped. The two releases were substantially similar. By signing the agreement, appellant specifically acknowledged that she had "no pre-existing mental or medical condition that would increase the risk of injury to myself or others as a result of my participation in the Series." She further acknowledged her understanding that the show was a " 'talk show' format discussion about topics of public interest and concern and that, by its nature, the Series includes heated discussions, commentary and remarks." Appellant acknowledged that she had been "told the general intended subject matter of the Episode, but have been made no promises regarding the specific content thereof." Appellant further agreed:

> "I covenant and agree not to sue Producer, Peteski Productions, Inc., Dr. Phillip C. McGraw and/or their respective distributors, partners, joint venturers, successors, heirs, . . . for any loss, claims or injuries of every kind and nature which I may now have, or may

4

hereafter acquire, arising out of or in connection with the Episode including, without limitation: (a) any claims, demands and causes of action for . . . infliction of emotional distress or any other tort in connection therewith; (b) because I do not like the manner in which Producer granted and/or used my name, voice, appearance, or Personal Information in the Episode (or derivative works); . . . (d) because I do not like the questions, responses or outcome of the Episode; and (e) because Producer did not fully disclose the subject matter of the Episode or the identity of other guests appearing on the Episode."

Appellant acknowledged that "no promises have been made to me other than as set forth herein, and I have not relied on any representations or other statements that are not contained herein." Appellant acknowledged and agreed that "this Agreement . . . constitutes a complete and binding agreement between Producer and me. I agree to submit exclusively to the jurisdiction of a court of competent jurisdiction located within the county of Los Angeles, State of California and agree that the California Rules of Civil Procedure, including, without limitation, CCP ANTI-SLAPP section 425.16 shall apply to any legal proceedings."

**The alleged misrepresentations**

Appellant alleged that respondents' producer pretended to believe appellant's claims of having psychic and supernatural powers. This producer told appellant that she could use her psychic powers to help McGraw with matters unrelated to her participation in the show. Appellant alleged that the producer told her that after she appeared live to discuss her boyfriend's alleged childhood trauma, she would have the opportunity to work alongside McGraw as he treated children with repressed

5

memories of abuse, since she had the unique ability to read people's minds and use X-ray vision to see their injuries. Appellant alleged that the producer "manipulated" her and further confused her perceptions of fantasy and reality.

In the preshow taping, respondents obtained preshow footage of appellant making the following statements:

1. "I died fifteen years ago and when I woke up I had psychic abilities. God sent me back with a mission and some gifts."

2. "I can speak French. I can write the Bengali alphabet. I can understand any foreign language."

3. "I have an effect on metal. So, like, if I think things that, um, God doesn't want me to think about, he'll like, bend my metal."

4. "The craziest thing that I know how to do is, I can hear what people think before they speak."

5. "At nighttime, I have X-ray visions. I can [see] where people's old broken bones—I can see, basically, the light of their skeleton."

6. "I also see spirits . . . I usually feel a presence behind me, like right now . . . ."

Appellant claims that as a clinical psychologist, McGraw "was acutely aware" that appellant's purported supernatural powers were actually delusions symptomatic of mental illness. Thus, appellant alleged, the television producer's promises to appellant were knowingly false, and McGraw plainly had no intention of associating with her. Appellant states that while respondents' ruse was obvious to those who do not suffer from mental illness, she was a vulnerable woman who fell victim to them and relied on them in agreeing to appear on the show.

Appellant claimed she had no idea that her own psychic abilities would be raised during the show:

> "No, one, including [the] TV Producer, ever sought or obtained my agreement or consent to appear on the [show] to discuss my mental health, history of mental illness, or my belief that I had psychic abilities. [The] TV Producer told [me] that the show would be about Matthew's abuse only. Based on our conversations, I was led to believe that any discussion of my psychic abilities would be privately with Dr. Phil after the show, not during it."

Appellant claims that she was told she was "required" to sign certain legal documents prior to appearing onstage. Appellant did not then know that the television producer had misrepresented and concealed significant facts from her regarding what would transpire on the show. Appellant therefore followed the instructions and signed the "required" documents.

**The show**

Appellant asserts that during the show, McGraw ambushed her with humiliating attacks on her delusional beliefs and exposed her mental disability on live television. Appellant claims that by the time the live portion of the show began, McGraw was aware that appellant suffered from a debilitating mental disorder.

The title of the live episode was "Brainwashing Con Artist or Loving Girlfriend? Who is Matthew Dating?" (*Dr. Phil* (CBS Television Distribution, Mar. 20, 2017).) The live episode began with Matthew, his mother, and his grandmother on stage. Matthew was described as a former Boy Scout who loved anything outdoors, had a job, an apartment, and "was on the right track to success." His mother and grandmother claimed that after he started dating appellant, "a woman 24 years older

7

than him," his life deteriorated to the point where he was living in an RV, not showering for weeks at a time and panhandling money to survive. Matthew's grandmother lamented that appellant was "manipulating Matthew," and she did not know how to stop it.

During the show, Matthew's mother and grandmother alleged that appellant had kidnapped Matthew and then turned him against his family. Appellant stated that she was professionally treating Matthew for mental health issues including sexual abuse problems that, she claimed, took place during Matthew's childhood with his mother and grandmother.

Before appellant made her entrance on stage, McGraw played the preshow footage of appellant describing her purported psychic abilities for the studio audience, in spite of his producer's alleged assurances to the contrary. McGraw then questioned appellant about her delusional beliefs, asking for a spontaneous demonstration of her supposed mind-reading abilities:

"McGraw: Can you tell me what I'm thinking right now?

"[Laughter from audience]

"[Appellant]: Um, it's not like one of those things that happens, like, under pressure, like, I can't really do it on demand necessarily.

"McGraw: Take your time.

"[Laughter from audience]

"[Appellant]: OK, well it's just like, it's just like, when the spirits show up, it's not like I get to just pick and say, 'OK, you know, you want to talk to your dead grandma' or whatever. I don't get to just pick.

"McGraw: I didn't ask you to mediate with the dead. I just asked you to tell me what I'm thinking.

"[Appellant]: I have no idea, honestly.

"McGraw: Well, but, you claim to be able to read people's minds!"

McGraw later asked appellant to demonstrate her X-ray vision for the audience, with the same result.[3]

At other points in the show, McGraw directed his questions regarding appellant's mental status towards Matthew, asking:

"Matthew, do you think that it's possible that somewhere along her journey through life, that [appellant] may have been damaged . . . and that this may have in some way distorted her perceptions somewhat? . . . Would you agree that some of her perceptions seem to be a little inconsistent with reality?"

---

[3]      "McGraw: Do you have X-ray vision?

"[Appellant]: Yeah, and I can also see, like, the footprints of people who have been there before, like spirits . . . .

"McGraw: I have a lot of broken bones. Can you tell me where they are?

"[Appellant]: I am not in a good space right now. I feel like I'm being totally attacked, and it's not—

"McGraw: No, you're being questioned because you're making some claims, and if you make those claims then you need to be prepared . . . well, you need to be prepared to defend them."

On another occasion, McGraw stated, ". . . I think [appellant's] confused, and I think she's, um—I—I think she needs to have some help . . . ."

Appellant admitted that in addition to being her patient, she and Matthew had established a romantic relationship. McGraw stated, "What the hell, lady?  You—you're sleeping with your patient?"

**Events after the show**

Appellant claims that she was shocked by McGraw's "derisive" interrogation about her purported psychic powers because she thought he believed that she had such powers and that the subject would not be discussed until after the show.  She was humiliated by the way she was treated on the show.

Almost immediately thereafter, appellant suffered a mental breakdown backstage:

> "I was sobbing on the floor and tearing at my hair. There were cameramen filming me, and when I told them to get away, they got closer.  The police showed up, placed me in custody, and took me to a mental health facility, where I was involuntarily committed for five days."

Since the show was broadcast on television and the Internet, appellant claims that she has suffered public ridicule, loss of employment, exacerbation of medical problems, and suicidal ideation:

> "My life has been a living hell after the show, and that is directly related to the severe emotional distress and mental anguish I suffered from being ambushed on stage and made to look like a crazy person on national television.  I have often wanted to kill myself.  I have a heart condition, and the aggravation and anxiety I have from the show has

made it worse, to the point where it is physically painful. . . . [¶] . . . I have been the target of online threats and harassment from people who saw the show . . . . They have called me a 'psycho b*tch' and 'evil horrid c*nt' who should 'die,' among other things. People sometimes recognize me from the show around town and will say insulting things to me. This has made my life miserable." Appellant alleged generally that McGraw solicits mentally ill psychiatric patients to be on his show, makes knowingly false representations regarding the nature and parameters of the show in order to convince guests to participate, then surprises them with embarrassing attacks on their diseased mental states.

**Respondents' anti-SLAPP motion**

On April 19, 2019, respondents filed an anti-SLAPP motion to strike appellant's complaint pursuant to section 425.16. Respondents asserted that appellant's action arose from protected activity, as the acts of creating and broadcasting a television show are in furtherance of the constitutional right of free speech. Respondents further asserted that appellant could not demonstrate a probability of prevailing on the merits of her claims, because her claims were not cognizable and subject to demurrer; were based on constitutionally protected speech; and because appellant was a limited purpose public figure and had voluntarily participated in a public controversy. Respondents also argued that the releases signed by appellant barred her claims since appellant's express agreement not to sue operated to discharge respondents from liability for the risks appellant assumed.

On May 3, 2019, appellant filed her opposition, arguing that the anti-SLAPP statute did not apply because respondents

11

did not establish a sufficient connection between the asserted public interest and their alleged conduct.  Appellant also argued that the wrongful conduct described in the complaint was directed specifically at appellant, and that appellant's own mental illness was not a subject of public interest.  Appellant filed a declaration in opposition to the motion repeating her allegations from the complaint.  She also filed declarations from Jori Nunes and Kelly Jass, who previously appeared on different episodes of the show and claimed similar treatment.

Respondents filed a reply and objections to the evidence submitted by appellant.  Appellant responded to the evidentiary objections and filed a first amended complaint.  The trial court struck the amended complaint for the purposes of ruling on the anti-SLAPP motion.

**Trial court ruling**

On May 17, 2019, the trial court overruled respondents' evidentiary objections to the declaration of appellant but sustained respondents' evidentiary objections in their entirety with respect to the declarations of Jori Nunes and Kelly Jass.

The trial court found that the respondents' actions on which appellant's claims were based "were all done in connection with creating, casting, and broadcasting a television show, which is an exercise of free speech."  (Citing *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143 (*Tamkin*).)  The court further found that appellant did not have a probability of prevailing on any of her five causes of action.  As to each cause of action, the court found that appellant failed to state a prima facie case.  The court therefore granted respondents' special motion to strike and struck appellant's complaint in its entirety.

**Notice of appeal**

On July 16, 2019, appellant filed a notice of appeal that the clerk of the court erroneously rejected on the ground that it did not conform to California Rules of Court, rule 2.100(c) and rule 2.256. On July 18, 2019, appellant's counsel spoke with the e-filing department supervisor and was informed that appellant's only recourse for the erroneous rejection was to file an ex parte application seeking a corrective court order. On July 31, 2019, appellant filed an ex parte application for an order directing the filing of appellant's notice of appeal nunc pro tunc to July 16, 2019. The trial court granted the application, and the notice of appeal was deemed filed as of July 16, 2019.[4]

---

[4] In a footnote, respondents note that *In re Z.S.* (2015) 235 Cal.App.4th 754 held that the consequences of a late-filed notice of appeal are not remediable. At oral argument, this court was informed that *Z.S.* has recently been disapproved by *In re A.R.* (2021) 11 Cal.5th 234, which held that where a parent in a juvenile dependency matter misses a deadline for appeal due to attorney incompetence, the appropriate remedy is to allow the appeal. These cases are irrelevant as the present matter does not concern a late-filed notice of appeal. Instead, the trial court implicitly found that—as appellant set forth in detail in her ex parte application—the notice of appeal was, in fact, timely and appropriately filed, and an error by the clerk of the court caused the notice of appeal to be wrongly rejected. Respondents do not argue that substantial evidence did not support the trial court's implicit factual determination that the notice of appeal was timely and correctly filed. Therefore, we assume the trial court's order was correct, and the notice of appeal was timely.

## DISCUSSION

### I. The anti-SLAPP law

Section 425.16 provides, in part, "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

The statute defines the type of activity that is protected under the statute: "As used in this section, 'act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue' includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

The fourth category "extends the protection of the anti-SLAPP statute beyond actual instances of free speech to all conduct in furtherance of the exercise of [the constitutional] right [of petition or the constitutional right of free speech] in

14

connection with a public issue or issue of public interest." (*Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027, 1036 (*Ojjeh*).) The "in furtherance of" requirement must be construed broadly. (*Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 166.) "'An act is in furtherance of the right of free speech if the act helps to advance that right or assists in the exercise of that right.'" (*Ojjeh, supra,* at p. 1039.) "The creation of a television show is an exercise of free speech." (*Tamkin, supra*, 193 Cal.App.4th at p. 143, citing *Winter v. DC Comics* (2003) 30 Cal.4th 881, 891-892.)

To determine whether a lawsuit or cause of action should be disposed of under section 425.16, courts use a two-part test. (*Tamkin, supra*, 193 Cal.App.4th at p. 142.) First, the moving party has the initial burden of showing that the lawsuit or cause of action "aris[es] from [an] act . . . in furtherance of [the moving party's] right of petition or free speech." (§ 425.16, subd. (b)(1); accord, *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).) In determining whether the anti-SLAPP statute applies, courts look to the gravamen of the complaint. (*California Back Specialists Medical Group v. Rand* (2008) 160 Cal.App.4th 1032, 1036-1037.) Our focus is not on the form of the plaintiff's causes of action, but rather on "the defendant's *activity* that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 92.)

Once the moving party has satisfied this initial step, the burden shifts to the opposing party to demonstrate the "probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1); accord, *Equilon, supra*, 29 Cal.4th at p. 67.) In order to meet the second prong of the test, a plaintiff

15

must state a legally sufficient claim.  (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 741.)  "'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.""'  (*Ibid.*)

"Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute—i.e., that arises from protected speech . . . *and* lacks even minimal merit—is a SLAPP, subject to being stricken under the statute."  (*Navellier v. Sletten, supra*, 29 Cal.4th at p. 89.)

## II.  Standards of review

Our review of an order granting an anti-SLAPP motion is de novo.  (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.)  In determining whether section 425.16 applies, we "'"accept as true the evidence favorable to the plaintiff [citation] and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law.""'  (*Flatley*, at p. 326.)

The standard of review applicable to the trial court's ruling sustaining respondents' objections to the declarations of Jori Nunes and Kelly Jass is abuse of discretion.  (*Public Employees' Retirement System v. Moody's Investors Service, Inc.* (2014) 226 Cal.App.4th 643, 683.)  Under this standard, "we will not overturn an evidentiary ruling on appeal unless 'the trial court exceeded the bounds of reason, all of the circumstances before it being considered.'"  (*Ibid.*)

## III.  The anti-SLAPP analysis

In determining whether the anti-SLAPP statute applies to bar appellant's lawsuit, we must independently determine each

step in the two-part test. We find that the statute is applicable, and appellant has not shown a probability of prevailing on her claims. Therefore, we conclude that appellant's complaint was properly stricken in its entirety.

### A.  *Threshold showing that complaint is based on protected activity*

#### 1.  *The allegations*

The allegations in appellant's complaint all arise from her participation in a nationally televised talk show. Appellant claims that in preshow actions soliciting her participation respondents made misrepresentations as to the content of the show and the purpose of appellant's appearance. Appellant claims that her appearance on the show was in reliance upon these alleged misrepresentations. Appellant asserts that during these preshow communications she disclosed that she had a mental illness and that respondent McGraw, with his training in psychology, should have recognized this illness. Appellant accuses respondents of calculating that publicizing and ridiculing appellant's mental illness "would make for good television."

Appellant further claims that during the actual filming of the show, McGraw "aggressively interrogated" her and demanded that she "defend" her delusional claims. In her presence during the filming of the show, McGraw spoke to appellant in a "mocking and sometimes bewildered tone," and asked her embarrassing questions. McGraw's actions caused the audience to laugh and jeer at appellant. Appellant asserts that McGraw acted in this way with knowledge that she would suffer severe emotional distress as a result. Appellant claims that the nature and scope of her appearance on the show bore no resemblance to what had been represented to her beforehand.

17

Appellant alleges that she suffered a mental breakdown backstage immediately following the show and was involuntarily committed to a mental health facility for five days. She asserts that she continues to suffer severe mental distress and experience threats and harassment following her appearance on the show.

### 2. *All alleged acts were undertaken in furtherance of respondents' exercise of free speech*

The allegations concern actions that were undertaken in furtherance of respondents' goal of casting, creating, and broadcasting a television show. Television shows are included within the protection of section 425.16 as exercises of free speech. (*Tamkin, supra,* 193 Cal.App.4th at p. 143.) The acts carried out in casting the show and preparing for the show helped to "'advance that right or assist[] in the exercise of that right.'" (*Ojjeh, supra,* 43 Cal.App.5th at p. 1039.) Thus, the allegations and all of the allegedly wrongful conduct described in the complaint arise from actions that are protected under the anti-SLAPP statute. (*Tamkin, supra,* at p. 143.) As such respondents met their initial burden of showing that the complaint "aris[es] from [acts] in furtherance of [respondent's] right of petition or free speech." (§ 425.16, subd. (b)(1).)

### 3. *There was sufficient connection between respondents' alleged acts and the public interest*

#### a. Applicable law interpreting the public interest requirement

Section 425.16, subdivision (e)(4) incorporates the conduct at issue in this lawsuit. Under that "catchall" provision protected conduct includes acts "'"in furtherance of a person's right of petition or free speech"' . . . 'in connection with a public issue or

18

an issue of public interest.'" (*Ojjeh, supra*, 43 Cal.App.5th at p. 1036, quoting § 425.16, subd. (e)(4).)  The provisions of section 425.16 must be construed broadly.  (*Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1039.)  Generally, an issue of public interest is any issue in which the public is interested.  (*Id.* at p. 1042.)  "In other words, the issue need not be 'significant' to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest."  (*Ibid.*)

Courts have recognized three general categories of cases that fall under the "connection with a public issue" prong of the test.  (*Jewett v. Capital One Bank* (2003) 113 Cal.App.4th 805, 813-814; accord, § 425.16, subd. (e)(4).)  "A public issue is implicated if the subject of the statement or activity underlying the claim (1) was a person or entity in the public eye; (2) could affect large numbers of people beyond the direct participants; or (3) involved a topic of widespread, public interest."  (*Jewett, supra*, at p. 814.)  Generally, in determining whether the speech or conduct at issue is an issue of public interest, courts "must consider the context as well as the content" of the act.  (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149 (*FilmOn*).)  Thus, "[t]he inquiry under the catchall provision . . . calls for a two-part analysis rooted in the statute's purpose and internal logic."  (*Ibid.*)

"First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking at the content of the speech.  (§ 425.16, subd. (e)(4).) Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest.  It is at the latter stage that context proves useful."  (*FilmOn, supra*, 7 Cal.5th at pp. 149-150.)

In other words, as the *FilmOn* court explained the statement or conduct must, in some way, "'contribute to the public debate.'" (*FilmOn, supra,* 7 Cal.5th at p. 150.) Thus, in determining whether an act is connected to a public issue or an issue of public interest, "the inquiry . . . is one a court can hardly undertake without incorporating considerations of context—including audience, speaker, and purpose." (*Id.* at pp. 151-152.) Only in "carefully observing this wedding of content and context" can we "discern if conduct is 'in furtherance of' free speech 'in connection with' a public issue or issue of public interest." (*Id.* at p. 154, quoting § 425.16, subd. (e)(4).)

      **b.**     This lawsuit involves an issue of public interest

Appellant asserts that respondents failed to establish a sufficient connection between the asserted public interest and their alleged conduct towards appellant. Instead, appellant argues, respondents made virtually no attempt to establish that their misconduct was connected to a public issue. While respondents claimed that both mental health and television shows are of public interest, appellant argues that her own mental health is not an issue of public interest. Appellant cites *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132 (*Weinberg*) for the proposition that "'public interest' does not equate with mere curiosity." Appellant asserts that her own mental health issues, which were highlighted on respondents' television show, serve no public interest other than curiosity.

The cases cited by appellant in support of this argument are distinguishable. In *Weinberg*, the dispute was between two token collectors. The defendant suspected the plaintiff had stolen a token from him. After confronting the plaintiff, the defendant

20

told other collectors that the plaintiff had stolen the token from him. The plaintiff sued the defendant for these allegedly false statements. In addressing the public interest requirement under section 425.16, the *Weinberg* court noted that "defendant did not present any evidence to show that plaintiff was anything other than a private, anonymous token collector; that their dispute was anything other than a private controversy; or that the communications were made to anyone other than a small group of other private parties." (*Weinberg, supra*, 110 Cal.App.4th at p. 1132.)

Here, in contrast, respondents presented evidence that all the alleged actions took place in the context of creating and broadcasting a widely viewed television show. The creation and broadcasting of a television show is an issue of public interest. (*Tamkin, supra*, 193 Cal.App.4th at p. 143 [CSI episode 913 is an issue of public interest]; see *Ojjeh, supra*, 43 Cal.App.5th at pp. 1043-1044 [proposed documentary about Syrian refugee crisis concerned issues of public interest]; *Brodeur v. Atlas Entertainment, Inc.* (2016) 248 Cal.App.4th 665, 675 [farcical movie was a matter of public interest]; *Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510, 1521 [selection of news anchor is in public interest]; *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798 (*Seelig*) [on-air discussion between talk radio hosts and their on-air producer about a television show is a matter of public interest].) Appellant's complaint describes the show as "the #1 daytime talk show," "[n]ow in its 17th season," and as a "trailblazing and award-winning show" that "continues to provide the most comprehensive forum on mental health issues in the history of television." The law is unequivocal that widely broadcast

21

productions such as the show are of public interest. In addition, mental health issues and matters of health in general are "'undeniably of interest to the public.'" (*Rivera v. First DataBank, Inc.* (2010) 187 Cal.App.4th 709, 716.) By engaging in a discussion of mental health issues in a public forum, the show clearly qualifies as involving matters of public interest under section 425.16.

Appellant next argues that the only interest served by broadcasting appellant's mental illness to the public is "that of curiosity." (Citing *Briscoe v. Reader's Digest Assn., Inc.* (1971) 4 Cal.3d 529, 537 (*Briscoe*), overruled by *Gates v. Discovery Communications, Inc.* (2004) 34 Cal.4th 679, 692.) As *Briscoe* is no longer good law, it does not advance appellant's argument that the subject episode of the show served no public interest other than curiosity. Appellant also cites *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898 (*Wilbanks*), for the proposition that "not all statements made in a public forum, and not all conduct in furtherance of the rights of petition or free speech, fall under section 425.16."[5] Appellant argues that the mental health of one indigent woman lends no legitimate contribution to discourse about mental health generally. However, appellant voluntarily

---

[5]     In *Wilbanks*, the conduct at issue—publication of statements about a small company on a Web site—was in the public interest despite evidence that "plaintiffs are not in the public eye, their business practices do not affect a large number of people and their business practices are not, in and of themselves, a topic of widespread public interest." (*Wilbanks, supra*, 121 Cal.App.4th at p. 898.) Because the publicized information fell under the topic of "'consumer information,'" it concerned a matter of public interest under section 425.16. (*Wilbanks*, at p. 899.)

agreed to appear on a show with a widespread audience of millions of viewers. The topic of the show is mental health, and the show and its guests have undeniably held the public interest for many years. In addition to her voluntary appearance, appellant freely shared her beliefs about her unusual powers with the show's creators in a prerecorded interview. Having agreed to appear on the show and that the topics of discussion on the live show were not limited in scope, appellant cannot now claim that her mental health status is private for the purposes of anti-SLAPP.

Appellant casts respondents' actions as trickery, stating that they are claiming protection for tricking vulnerable psychiatric patients into divulging the details of their mental disease and using this ammunition to humiliate them. We note that courts have generally not accepted similar arguments when nonpublic individuals interject themselves into a public debate in a public forum. For example, in *Ingels v. Westwood One Broadcasting Services, Inc.* (2005) 129 Cal.App.4th 1050 (*Ingels*), an individual sought to participate in a call-in radio talk show by calling in to the show to confront the host, who was giving advice on relationships. (*Id.* at p. 1056.) In determining that the plaintiff's claims resulting from the call fell within the scope of section 425.16, the *Ingels* court noted that the claims arose from the plaintiff's "attempt to express himself in an open forum carried over the airwaves of public radio." (*Ingels, supra*, at p. 1064.) In this context, the *Ingels* court had "no trouble concluding that respondents' activity . . . fits within the scope of section 425.16, subdivision (e)(4)." (*Ibid.*)

Similarly, in *Seelig, supra,* 97 Cal.App.4th 798, a woman who had appeared as a contestant on the television program *Who*

23

*Wants to Marry a Millionaire* (Fox Network, Feb. 15, 2000) was contacted by a radio show requesting her to appear live on the show and discuss her participation in the television show. Though she declined to appear on the live radio show, the hosts nevertheless discussed and allegedly slandered her. (*Id.* at pp. 801-805.) In determining that the woman's lawsuit against the radio show and its hosts fell within the purview of section 425.16, the *Seelig* court noted that, "[b]y having chosen to participate as a contestant in the Show, plaintiff voluntarily subjected herself to inevitable scrutiny and potential ridicule by the public and the media." (*Seelig, supra*, at p. 808.) Appellant in this matter voluntarily subjected herself to the same kind of public scrutiny and potential ridicule.

Appellant's objection that she was publicly humiliated for the sheer amusement of a television audience does not change the result. The value of the speech at issue is not part of the analysis: "We are not concerned with the social utility of the speech at issue . . . ; rather, we examine whether a defendant— through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*FlimOn, supra*, 7 Cal.5th at p. 151.)

       **c.**  The result is not based on the synecdoche theory of public issue

Appellant argues that the trial court's ruling was based on "the oft-rejected, so-called 'synecdoche theory of public issue in the anti-SLAPP statute,' where '[t]he part [is considered] synonymous with the greater whole.'" (*World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1570.) The *World Financial* court explained that one could arguably identify a strong public interest in nearly

every topic.  However, "'[t]he fact that "a broad and amorphous public interest" can be connected to a specific dispute is not sufficient to meet the statutory requirements' of the anti-SLAPP statute."  (*Ibid.*)  In *World Financial,* credit card solicitations did not implicate matters of public interest for the purposes of section 425.16 where such communications were "merely solicitations of a competitor's employees and customers undertaken for the sole purpose of furthering a business interest."  (*World Financial, supra*, at p. 1572.)  While the court did not dispute that "employee mobility and competition are issues of public interest," the specific nature of the speech at issue removed it from the protections of section 425.16.  (*World Financial, supra*, at p. 1572.)  Any other outcome would "effectively 'eviscerate the unfair business practices laws,' a result the Legislature plainly did not intend."  (*Ibid*.)  *World Financial* involved commercial speech and is not comparable to the present situation.

Appellant also relies on *Dyer v. Childress* (2007) 147 Cal.App.4th 1273 (*Dyer*).  In *Dyer,* Troy Dyer sued the defendants for the allegedly false portrayal of him in the movie Reality Bites (Jersey Films; Universal Pictures 1994).  Dyer attended film school with Childress, the author of the screenplay that eventually became the movie in which a rebellious slacker portrayed by Ethan Hawke was given the name Troy Dyer.  (*Id.* at pp. 1276-1277.)  The defendants filed an anti-SLAPP motion, arguing that the film addressed broad topics of public interest. While the *Dyer* court acknowledged that movies involve free speech, it concluded that "not all speech in a movie is of public significance."  (*Id.* at p. 1280.)  Instead, "[t]he issue turns on the specific nature of the speech rather than the generalities abstracted from it."  (*Ibid.*)  The speech at issue was the "asserted

25

misuse of Dyer's persona." (*Ibid.*) While the movie addressed some topics of public interest, "the representation of Troy Dyer as a rebellious slacker is not a matter of public interest and there is no discernable public interest in Dyer's persona." (*Ibid.*) The court specified that "[t]he fact that 'a broad and amorphous public interest' can be connected to a specific dispute is not sufficient to meet the statutory requirements." (*Ibid.*)

Notably, the *Dyer* court distinguished *Ingels* and *Seelig*, discussed above, because the plaintiffs in those cases "voluntarily thrust themselves into a discussion of public topics." (*Dyer, supra,* 147 Cal.App.4th at p. 1281.) "Dyer, on the other hand, did not interject himself into any public debate." (*Ibid.*) Here appellant did inject herself into the public debate regarding mental health by voluntarily agreeing to appear on the show. Thus, unlike the *Dyer* plaintiff, appellant cannot argue that she has no connection to the issues of public interest discussed on the show.

The remaining cases cited by appellant are similarly distinguishable. (*Dual Diagnosis Treatment Center, Inc. v. Buschel* (2016) 6 Cal.App.5th 1098, 1106 [allegedly defamatory statements about substance abuse treatment center published in weekly electronic newsletter were not about the public issue of addiction treatment but simply about "the purported license status of that particular facility"]; *Bikkina v. Mahadevan* (2015) 241 Cal.App.4th 70, 80-84 [statements made by advisor about student in university complaint process and to a small number of other students were not made in a public forum and constituted a private campaign to discredit another scientist, thus were not an issue of public interest]; *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 111 [allegedly false statements

26

reflecting negatively on plaintiff's business reputation were not matters of public interest because they concerned the plaintiff's specific business practices], disapproved of by *Baral v. Schnitt* (2016) 1 Cal.5th 376; *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 602 [advertising about the properties of pill not a matter of public interest because the phrase does not include "advertising statements about a particular commercial product"]; *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924 [statements concerning supervision of a staff of eight people "hardly a matter of public interest"].) None of the cases involves a plaintiff who voluntarily appeared on a widely broadcast television show to engage in a debate on an issue of public concern.[6]

In sum, respondents have met their initial burden of showing that the conduct at issue in this lawsuit arises from acts undertaken in furtherance of their constitutional right of free

---

[6] Nor do the federal cases cited by appellant convince us that the discussion on the show involving appellant's purported abilities were not in the public interest. In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.* (1985) 472 U.S. 749, a credit report was not an issue of public concern where it "was made available to only five subscribers, who, under the terms of the subscription agreement, could not disseminate it further." (*Id.* at p. 762.) In *City of San Diego v. Roe* (2004) 543 U.S. 77, videos of sexual activity created by a police officer were not matters of public concern because they were not "a subject of general interest and of value and concern to the public at the time of publication." (*Id.* at p. 84.) The show on which appellant chose to appear was unquestionably of interest to the general public at the time it was created.

speech in connection with a public issue or issue of public concern.  (§ 425.16, subd. (e)(4).)

## B.  *Probability of prevailing*

Respondents met their initial burden of showing that appellant's complaint is based on activity protected by section 425.16.  The burden thus shifts to appellant to demonstrate a probability of prevailing on her claims.  We analyze each claim separately below and conclude that appellant has not made the required showing as to any of her causes of action.[7]

### 1.  *Intentional infliction of emotional distress (IIED)*

The elements of the tort of IIED are: "'"(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct."'"" (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 903.) Whether a defendant's conduct can reasonably be found to be outrageous is a question of law to be initially determined by the court.  (*Berkley v. Dowds* (2007) 152 Cal.App.4th 518, 533.)  The alleged conduct must be so extreme as to exceed all bounds of what is usually tolerated in a civilized community.  (*Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 494.)  "The defendant must have engaged in 'conduct intended to inflict injury or engaged in

---

[7]    Appellant's opening brief does not mention or address her negligent misrepresentation claim.  Therefore, we decline to discuss it and treat any appeal of this cause of action as forfeited. (*Stoll v. Shuff* (1994) 22 Cal.App.4th 22, 25, fn. 1 [in the absence of a serious effort to raise an issue on appeal, it is waived].)

with the realization that injury will result.'" (*Christensen, supra*, at p. 903*.*) "'"[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities"'" are not subject to an IIED claim because the law does not intervene when "'"some one's [*sic*] feelings are hurt."'" (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 946, disapproved on other grounds by *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 571-572.)

Appellant argues that her IIED claim is supported by her allegations that respondents solicited a mentally ill psychiatric patient to appear on the show, pretended to believe she had psychic abilities, convinced her to take the stage by misrepresenting what would happen once the cameras started rolling, then ambushed her by mocking her delusional beliefs while the audience laughed. Appellant argues that this is outrageous conduct by any standard. Appellant further argues that it is reasonable to infer that respondents' actions were calculated to cause appellant immediate and severe emotional distress.

Appellant fails to cite facts sufficient to show that the acts alleged were so extreme as to exceed the bounds of what is tolerated in a civilized community. (*Cochran v. Cochran, supra*, 65 Cal.App.4th at p. 494.) The show has engaged in this type of production throughout its history as a talk show; and, not only has it been tolerated, it has been accepted and approved of by many viewers. In addition, appellant has failed to present any evidence that she was a "mentally-ill psychiatric patient" or was under the care of a mental health professional at the time of respondents' alleged acts. Nor has she presented any evidence suggesting that she informed respondents of a specific mental health diagnosis or disorder. Thus there is no evidence that

29

respondents knowingly took advantage of her purportedly vulnerable state.

Further, appellant's claim is based on her assertion that she was mocked. She alleges that McGraw invited her onto his nationally televised program and made fun of her claims that she had supernatural powers. Although this was embarrassing for appellant, to which she had a strong, emotional reaction, this mocking behavior is not actionable. Mere indignities or insults may not, as a matter of law, form the basis of an IIED claim. (*Agarwal v. Johnson, supra*, 25 Cal.3d at p. 946.)

Appellant cites *Golden v. Dungan* (1971) 20 Cal.App.3d 295, 303, footnote 6 (*Golden*), which explains that "'[t]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or mental condition or peculiarity.'" However, appellant fails to point to evidence showing that she alerted respondents that she was particularly susceptible to emotional distress. Nor is there any evidence from which we can draw such an inference. On the contrary, appellant presented as ready and willing to appear on the show and discuss her purported abilities. Further, as the *Golden* court noted, even in cases where the IIED plaintiff is particularly susceptible to emotional distress, "major outrage is essential to the tort; and the mere fact that the actor knows that the other will regard the conduct as insulting, or will have his feelings hurt, is not enough." (*Ibid.*) Respondents' conduct, which consisted of questioning appellant about her beliefs on national television, did not fit under the description of a major outrage.

30

Appellant failed to state a claim for IIED as she did not allege sufficiently outrageous conduct.

### 2. *Fraud*

The elements of fraud are "'(1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (i.e., to induce reliance); (4) justifiable reliance; and (5) resulting damage.'" (*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239.)  In a claim of fraud the elements must be alleged with specificity. (*Nagy v. Nagy* (1989) 210 Cal.App.3d 1262, 1268.)

In support of her claim of fraud appellant alleged that respondents made misrepresentations to her to induce her to appear on the show.  These alleged misrepresentations included: (1) her appearance on the show would be limited to discussing childhood abuse her boyfriend claimed to have suffered; (2) the nature of appellant's appearance was to support her boyfriend in confronting his alleged abusers; and (3) if she participated in the show she would later have the opportunity to work with McGraw as he treated children with repressed memories of abuse. Appellant failed to specify the date and speaker of each alleged misrepresentation, instead simply generalizing that "defendants" made such misrepresentations.  Appellant also alleged generally that respondents concealed material facts concerning her appearance on the show—for example, respondents never informed appellant that the program would address her mental illness or delusional beliefs.  Appellant alleged that respondents knew the misrepresentations were false when they were made and that she relied on them.

In order to satisfy her burden under the second prong of the anti-SLAPP analysis, appellant must "substantiate the legal

31

sufficiency of [her] claim." (*DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 568.) In other words, it is not sufficient that she has alleged a legally sufficient claim— she "must provide the court with sufficient evidence to permit the court to determine whether 'there is a probability that the plaintiff will prevail on the claim.'" (*Ibid.*; accord, § 425.16, subd. (b)(1).)

Appellant did not provide sufficient evidence to substantiate her fraud claim. Appellant presented no admissible evidence other than her declaration. In her declaration, she states that a producer told her if she agreed to appear on the show, she would later have an opportunity to work with McGraw as he treated children with memories of abuse because she could read their minds and see their injuries. There is no evidence that the unnamed producer had knowledge of the falsity of the statement or intended to defraud appellant.[8] Further considering the vague nature of this alleged promise, there is no evidence of appellant's reliance on the promise. Finally, there is no evidence

---

[8] In appellant's own words the unnamed producer stated that appellant's supernatural powers "would be a big help to Dr. Phil and *could be* the start of a professional relationship between us." (Italics added.) The italicized words show that the speaker was stating a possibility of a hypothetical future development dependent upon various factors—not a false assurance of future employment. It appears that the speaker provided conjecture that if appellant in fact showed an exceptional talent, McGraw *could* consider working with her in the future. "'[P]redictions as to future events, or statements as to future action by some third party, are deemed opinions, and not actionable fraud.'" (*Tarmann v. State Farm Mut. Auto. Ins. Co.* (1991) 2 Cal.App.4th 153, 158.)

that appellant suffered any economic damage resulting from this promise. (See *Alliance Mortgage Co. v. Rothwell, supra*, 10 Cal.4th at p. 1240 [unless a plaintiff merely seeks to rescind a contract, she must show actual monetary loss to recover on a fraud claim]).

The trial court observed that appellant admitted she did not justifiably rely on respondents' purported promises. At the hearing on the motion appellant's counsel stated:

> "Just by way of example, you know, you're going to be able to use your psychic powers to help Dr. Phil treat child abuse victims if you just agree to appear on the show. [¶] As I said, that is a ludicrous statement. It could not have possibly been true. Nobody could have believe[d] it to be true."

In response to the court's inquiry, "So how can you rely on it," appellant's counsel responded, "Because she's delusional and suffers from mental illness and [respondents'] agent went out of his way to play along with her delusional beliefs." However, appellant's counsel confirmed that "everybody here who doesn't suffer from sincerely held delusional beliefs can immediately look at that and recognize that that promise was absurd."

On appeal appellant asks that we categorize her as an "'[e]xceptionally gullible or ignorant'" person of below normal intelligence. (Citing *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1667 (*Boeken*).)[9] Appellant presented no

---

**9** The *Boeken* court stated, "'Exceptionally gullible or ignorant people have been permitted to recover from defendants who took advantage of them in circumstances where persons of normal intelligence would not have been misled. [Citations.] "No rogue should enjoy his ill-gotten plunder for the simple reason

admissible evidence of any specific mental health diagnosis, only declaring that at various times throughout her life she had been diagnosed and treated with "various psychiatric disorders." Appellant points to no evidence in the record specifying any such disorder or explaining its effects.[10] There is no evidence showing that she can be categorized as exceptionally gullible, ignorant, or below normal intelligence. Thus, the quote from *Boeken* does not assist her in making a claim for fraud.

Appellant has failed to provide evidence supporting her claim for fraud. She has failed to present specific facts regarding the alleged misrepresentations, failed to provide any evidence at all of respondents' knowledge of fraud or intent to deceive, and failed to provide evidence of justifiable reliance. Under the circumstances she has failed to show a probability of prevailing on her claim for fraud.

### 3. *Unfair competition*

Business and Professions Code section 17200 et seq., or unfair competition law (UCL), prohibits "any unlawful, unfair or

---

that his victim is by chance a fool."'" (*Boeken, supra*, 127 Cal.App.4th at p. 1667.)

[10] Appellant set forth in her declaration that "Via text message or email, I sent [respondents'] TV Producer a written medical diagnosis by my physician indicating that I was being treated for multiple psychiatric disorders. [Respondents'] TV Producer asked me to do this." However, appellant does not provide a citation to a page in the record showing any such text message or e-mail. Nor does she specify the diagnosis or the physician's name or qualifications. Appellant cites no law supporting the notion that unsupported references to a mental health diagnosis justify her reliance on admittedly "ludicrous" alleged promises.

34

fraudulent business act or practice." (Bus. & Prof. Code, §§ 17200, 17203.) "The UCL's purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." (*Kasky v. Nike, Inc.* (2002) 27 Cal.4th 939, 949 (*Kasky*).) To determine whether a case involves speech that falls under the laws aimed at preventing false advertising or other forms of commercial deception, a court must consider the speaker, the intended audience, and the content of the message. (*Id.* at p. 960.)

In typical commercial speech cases, the speaker is likely to be someone engaged in commerce—that is, generally, the production, distribution, or sale of goods or services—or someone acting on behalf of a person so engaged, and the intended audience is likely to be actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers. (*Kasky, supra,* 27 Cal.4th at p. 960.)

Commercial speech is generally directed towards "an audience of persons who may be influenced by that speech to engage in a commercial transaction with the speaker," and is typically speech about a "product or service at a price, directed to persons who may want, and be willing to pay for, that product or service." (*Kasky, supra,* 27 Cal.4th at pp. 960-961.) The factual content of such speech is "commercial in character," consisting of representations about "business operations, products, or services of the speaker." (*Id.* at p. 961.)

The UCL protects only commercial speech, as described in *Kasky*, and does not extend to noncommercial speech. (*Kasky, supra*, 27 Cal.4th at p. 952.) None of the allegations in appellant's complaint concern the type of commercial speech

described in *Kasky*.  Nor does appellant provide us with facts or legal authority suggesting that any of the alleged speech at issue in this case can be categorized as commercial speech covered by the UCL.  Under these circumstances, appellant has failed to state a viable claim for violation of the UCL.  (*Kasky, supra*, at p. 952.)

### 4.   *Rescission*

Under Civil Code section 1689, subdivision (b)(1), a party may rescind a contract if her "consent . . . was given by . . . fraud."  Civil Code section 1689, subdivision (b)(5) further provides that a contract may be rescinded if it "is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault."  Appellant asserts that she testified in her declaration to essential facts supporting a claim for rescission.  Appellant asserts that the same facts that support her claim for fraud support her claim for rescission.  "Fraud is one of the grounds on which a contract can be rescinded." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 973.)

As set forth above, appellant has failed to state a prima facie case of fraud.  She has failed to provide specific information regarding the allegedly fraudulent statements; evidence showing the alleged speaker's knowledge of fraud or intent to defraud; or evidence of justifiable reliance.  In the absence of these elements appellant's claim of fraud cannot survive respondents' anti-SLAPP motion.  Thus, like her other claims, appellant's rescission claim has no probability of prevailing.[11]

---

[11]    Because we have determined that the anti-SLAPP statute applies and appellant has no probability of prevailing on the appealed causes of action, we decline to discuss the parties'

36

## IV.  Evidentiary rulings

Appellant argues that the trial court abused its discretion in sustaining respondents' objections to the declarations of Jori Nunes and Kelly Jass.  These declarants alleged that they, like appellant, had been deceived into appearing on the show.  Respondents objected to the admission of these declarations on the grounds of relevance and hearsay.  The trial court sustained all of respondents' evidentiary objections.

Appellant provides no argument or citation to authority regarding the specific grounds for respondents' objections.  Nor does she provide any reasoned argument or citation to authority suggesting that the trial court abused its discretion in sustaining the subject objections.  Under the circumstances appellant has forfeited on appeal her argument that the trial court abused its discretion.  (*Garcia v. Seacon Logix, Inc.* (2015) 238 Cal.App.4th 1476, 1489 [appellate brief must contain legal argument with citation to authorities or the point will be deemed forfeited].)

However, we note that only relevant evidence is admissible.  (Evid. Code, § 350.)  Appellant fails to explain how the declarations of Jori Nunes and Kelly Jass assist in proving any of appellant's allegations as to the events at issue in this lawsuit.  Appellant also fails to explain how such evidence could be admissible considering the restriction found in Evidence Code

---

competing arguments as to whether appellant was a limited purpose public figure.  If appellant could be described as a limited purpose public figure, she would be required to prove actual malice as to any purported false statements.  (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256.)  We need not reach the issue of whether the actual malice standard applies to appellant, as her claims fail without reaching this issue.

section 1101, subdivision (a), which provides that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Under Evidence Code section 1101, subdivision (a), the declarations of Jori Nunes and Kelly Jass are irrelevant. In the absence of reasoned, legally supported argument, we have no basis to find that the trial court abused its discretion in excluding the declarations.[12]

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs of appeal.


_____, J.
CHAVEZ

We concur:


_____, P. J.
LUI


_____, J.
ASHMANN-GERST

_____

[12] We decline to discuss appellant's argument that her claims are not barred by the liability waivers she signed. Appellant argues that the two waivers she signed were procured by fraud. Because all causes of action are subject to dismissal under section 425.16, we need not reach this issue.